IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF GEORGIA
ATLANTA DIVISION

MARC MAGLOIRE

      Plaintiff,

v.

CITY OF SOUTH FULTON, GA

      Defendant.

Civil Action No.:

<u>Jury Trial Demanded</u>

## **<u>COMPLAINT</u>**

COMES NOW Plaintiff Marc Magloire, by and through his undersigned counsel, to file this employment discrimination lawsuit against the City of South Fulton, GA, ("Defendant"), pursuant to Title VII of the Civil Rights Act of 1964, ("Title VII"), 42 U.S.C.A. § 2000e-3(a) and the Americans with Disabilities Act,, 42 U.S.C. § 12112(b)(1) ("ADA"), the Family and Medical Leave Act ("FMLA"), 29 U.S.C.A. § 2601 et seq.,  U.S.C.A Const. Amends. 1 and 14, and 42 U.S.C.A. § 1983, as well as a supplemental claim under the Georgia Whistleblower Act (O.C.G.A. § 45-1-4).  This action is brought to hold the City of South Fulton accountable for violating a public employee's federally protected rights when the

City subjected him to a persistent campaign of retaliation after he reported sexual harassment and bullying to supervisors and the EEOC.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over the federal claims asserted in this action under 28 U.S.C. §§1331 and 1343.

2.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), as Defendant is located in this District and division, and the events or omissions giving rise to the claims occurred in this District and division.

3.     This Court has supplemental jurisdiction of the state law claim Plaintiff asserts, pursuant to 28 U.S.C. §1367.

## PARTIES

4.     Plaintiff, Marc Magloire (hereinafter, "Mr. Magloire") is a resident of Powder Springs, Georgia, and at all times relevant to this complaint, was employed by Defendant as a Firefighter.

5.     Plaintiff is a covered employee under Title VII, the ADA, FMLA and the Georgia Whistleblower Act during the period in which they were employed by Defendant.

6.     Defendant is an employer as defined by Title VII, the ADA, FMLA and the Georgia Whistleblower Act, and  is therefore subject to their provisions.

7.    The City of South Fulton is a municipality of the State of Georgia and is responsible for the funding and operation of the South Fulton Department of Human Resources and the South Fulton Fire Department.   The City of South Fulton may be served with summons at 5440 Fulton Industrial Blvd, Atlanta, Georgia 30336.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.    On March 28, 2022, Plaintiff timely filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging sexual harassment, disability discrimination, and retaliation under Title VII and the ADA.   The Department of Justice issued Right to Sue letters to Plaintiff on January 16, 2024. This lawsuit is initiated prior to his statutory deadline of 90 days.

## FACTUAL ALLEGATIONS

9.    Marc Magloire was employed by the South Fulton Fire Department ("CSFFD" or the "Department") as a firefighter from March 17, 2020 to November 15, 2022.

10.    Magloire was terminated on November 15, 2022, after complaining about physical assault, discrimination and retaliatory harassment. The termination occurred after Defendant became aware that he was interviewed by the EEOC and while Defendant's internal investigation of Magloire's complaints remained pending with the City of South Fulton's Human Resources Department.

3

11.    Magloire received a Life Saving Award on July 19, 2022 for his heroism in saving the life of a 27 years old, and he received a positive performance review on July 20, 2022.

12.    The training and certifications Magloire completed during his probationary period confirmed that he was qualified and competent to perform the core duties of an Emergency Medical Technician and Firefighter.

13.    Magloire successfully completed the Georgia Basic Firefighter Curriculum, which included Emergency Medical Services certification training. Magloire also successfully completed the South Fulton Fire and Rescue Department Probationary Firefighter Program.  After completing his probationary period, Magloire was promoted to a full-time Firefighter position on April 9, 2021.

14.    For the first 2 years of Magloire's employment, he received no contemporaneously documented counseling or disciplinary action.

15.    Alleged concerns regarding Magloire's performance were not documented until well after he complained about harassment on November 7, 2021, involving a physical assault by a coworker.

16.    After Magloire successfully completed his training, and began working as a firefighter at Station 7, he quickly realized that he was being subjected to sexual harassment, physical violence, bullying, abusive and offensive language, teasing, rumor spreading, innuendos about this sex life, unreasonable

criticism, trivializing of his work and achievements, belittling and criticizing in public - all of which violated the City's Policy Number: 119 -18 Re: Workplace Violence and Anti-Bullying.

17.    Magloire observed a hostile work environment in the fire department on nearly a weekly basis.  Magloire was constantly in a state of fear that he would be terminated for voicing concerns about the hostile work environment and the frequent violations of policies against harassment and bullying.

18.    Once the harassment and bullying turned violent, Magloire was compelled to complain.

19.    On or about November 7, 2021, Magloire reported to supervisors that he was harassed and physically assaulted by a coworker, Marlon Brown.  As instructed by Captain David Roseboro, Magloire submitted a written complaint via email to Acting Chief Jerry Nears regarding the assault incident involving the coworker, but he did nothing to address it.  Instead, Magloire's supervisors responded to the complaint by pressuring him not to report the harassment and assault to Human Resources, and threatening to have him fired over minor criticisms of his cleaning at the station house.

20.    Supervisors told Magloire that the assault referenced in his written complaint would be investigated but it was never forwarded to Human Resources,

as required by City's Policy Number: 119 -18 Re: Workplace Violence and Anti-Bullying.

21.     Instead of referring the matter to Human Resources for investigation, his supervisors minimized Magloire's concerns regarding harassment and used the incident as an opportunity to begin developing a narrative that he was a poor performer, who was unfit to handle the stress of being a firefighter because he refused to tolerate the harassment he was subjected to by supervisors and coworkers.

22.     On or about December 21, 2021, Magloire complained to Sergeant Denisha Langston that he was being bullied by a coworker on a weekly basis. Sergeant Denisha Langston acknowledged that the hostile work environment was a problem at the fire department but did not investigate or forward Magloire's concerns to HR, as required by the City's Policy Number: 119 -18 Re: Workplace Violence and Anti-Bullying.

23.     In January 2022, newly promoted Battalion Chief Jeffery Potter assumed command of Fire Station 7, and on his first day informed the crew that he stated that he was aware of the bullying and harassment in the Station 7 and stated that "it will end today."  Magloire was pleased to hear Chief Potter acknowledge what he was experiencing on nearly a weekly basis, and was hopeful that Chief Potter would address the hostile working environment.

24.     However, Chief Potter did not forward Magloire's concerns about bullying and harassment to HR for investigation, as required by City Policy Number: 119 -18 Re: Workplace Violence and Anti-Bullying.

25.     Despite Chief Potter's warning that the harassment must end, the harassment continued to occur on a nearly weekly basis.  In fact, Chief Potter also engaged in inappropriate sexual discussions at work.  In January or February of 2022, Magloire observed Chief Potter saying that Pam Grier is someone he would have sex with because he only dated "Cappuccino" women.

26.     Chief Potter also asked Magloire if he had sex before.  The offensive and sexualized conduct of Chief Potter was typical of what Magloire had experienced on a nearly weekly basis.  Magloire was devastated that he had to continue dealing with sexually harassing conduct, especially from a Chief who he had previously pledged to end the harassing conduct.

27.     On April 24, 2022, another supervisor, Acting Chief Jerry Nears, started asking Magloire questions about his sex life, including if he was a virgin and how many times he had sex.  Magloire was devastated that he had to continue dealing with sexually harassing conduct, especially from a supervisor whom he had already asked to address complaints regarding harassment and assault by a coworker.

28.   On or about May 1, 2022, Magloire complained to supervisors, Captain Sammy Hart and Sergeant Eric Anderson about Chief Near's harassing conduct.  Captain Hart advised Magloire to start documenting the harassment. Magloire had already started by submitting a written complaint via email on November 9, 2021.  Supervisors Hart and Anderson did not forward the complaint to HR for investigation, as required by City Policy Number: 119 -18 Re: Workplace Violence and Anti-Bullying.

29.   Two weeks later, on May 14, 2022, Defendant informed Magloire that he had to retake the probationary examinations, despite having already passed them and he was already off probation.

30.   Magloire complained to Captain Sammy Hart about this, and Hart said that in his 30 years of service he had never once heard of anyone being asked to retake the certification tests or being placed back on probation.  Hart did not report this unprecedented treatment to HR for investigation, as required by City Policy No. 118-18.

31.   On or about May 26, 2022, Lieutenant Camille Dunnings became Magloire's new supervisor on Engine 7.  Magloire shared with Dunnings his concern that his harassment complaints were not being taken seriously.  Dunnings told Magloire that she was aware of his complaints about harassment by Chief Nears, and told him that it was being handled.

32.    On June 2, 2022, shortly after Magloire's discussion with Lieutenant Dunnings, Magloire received a retaliatory counseling for the minor offense of "damaging a helmet" while he was assisting with the unloading of equipment from a fire engine.

33.    The retaliatory counseling for "damaging a helmet" was supported by false and unnecessary documentation, including a fabricated written statement falsely attributed to Magloire.

34.    The helmet incident was the first contemporaneously documented issue with Magloire's performance since he was hired two years prior on March 17, 2020.  This fact raises an inference of retaliation and pretext.

35.    Two weeks later on June 14, 2022, Defendant forced Magloire to retake the probationary examinations, despite there only being one minor documented concern regarding a damaged helmet, and no other discussions with him regarding a performance issue.

36.    Magloire took and passed the probationary examinations for the second time.

37.    Despite passing the examinations for the second time, Magloire was kept on probation indefinitely for no valid reason.

38.    Magloire's repeated passing of the examinations should have put to rest any alleged concerns regarding his knowledge, skills and training, however

Defendant persisted in trying to create a narrative that Magloire was a poor performer, to discredit his complaints about harassment and to prepare a cover story for future adverse actions against him.

39.    Only July 19, 2022, Magloire received an award for saving the life of a 27 year old.  The award letter specifically stated,

> "Your accomplishment is a testament, as a firefighter, to the embodiment of the department's mission statement, vision and core values. Continue to perform the great work that you have been doing and Earn your Shield every day."

40.    On July 20, 2022, Magloire received a positive performance evaluation from his supervisor, Lieutenant Dunnings.  His overall performance rating indicated that was evaluated as "Successful" in all assessment factors.  The evaluation included no "Unsatisfactory" ratings on any assessment criteria. Nothing in his performance evaluation indicated a legitimate basis for placing him on a Performance Improvement Plan.

41.    Magloire signed the July 2022 performance evaluation and observed his supervisor insert the original document into a filing cabinet at Station 7.

42.    The original evaluation Magloire signed made no references to any concerns about the quality of his work, his handling of patients, nor any concern that he needed to "work on managing stress in critical situations in order to make better tactical decisions." The only discussions Magloire held with Lieutenant Dunnings regarding "managing stress" were related to the hostile work

environment that coworkers and supervisors subjected him to, which included physical violences, sex talk and inquisitions regarding his private sex life.

43.    Defendant later added negative remarks to an unsigned version of Magloire's performance evaluation and produced it to support its mischaracterization of Magloire as a poor performer.

44.    On July 29, 2022, Magloire was harassed and bullied by Chief Jerry Nears, the same supervisor who had previously asked Magloire offensive questions about his sex life and pressured him not to report his harassment concerns to HR. The harassment and bullying ensued following a dispute about whether Magloire timely performed a minor cleaning duty.  Chief Nears stood within inches of Magloire's face and screamed expletives at him and threatened to start paperwork to have Magloire terminated.

45.    Magloire was deeply disturbed by the attack from Chief Nears and immediately complained to Assistant Chief Jimmy Gittens regarding the ongoing harassment and retaliatory bullying.  Magloire was forced to discuss the harassment in a meeting in the same room as Chief Nears, so he did not feel that he could speak openly and candidly, but he did report that he felt he was being harassed by Chief Nears.

46.    Despite Chief Gittens being made aware of Magloire's previous complaints regarding harassment by Chief Nears, as well as the incident on July

29, 2022, Gittens did not forward the complaint to HR for investigation, as required by City Policy Number: 119-18 Re: Workplace Violence and Anti-Bullying.

47.    Instead, Magloire was temporarily reassigned to Station 6 for a brief time and then to Station 1 for two shifts, before he was returned to Station 7 working under Chief Nears again in early August of 2022.

48.    While temporarily reassigned to Station 6, Magloire complained to supervisors Captain Sammy Hart and Sergeant Kenneth Perea on or about July 30, 2022 regarding the harassment and bullying he was experiencing at station 7, only to be told by Sergeant Perea that harassment was "meant to make him a better firefighter."   Supervisors Hart and Perea failed to refer Magloire's harassment concerns to HR, as required by City Policy No. 118-18.

49.    On July 29, 2022, shortly after Magloire complained about the harassment by Chief Nears, Assistant Chief Jimmy Gittens contacted the City's contracted Psychologist, Dr. Carla Moore, and Deputy Chief Pat Wilson, and informed them that he had "saftey" concerns regarding Magloire's fitness for duty..

50.    On or about August 3, 2022, Magloire met with Chief Potter in his office.  Potter asked Magloire about the complaint he made against Chief Jerry Nears.  Chief Potter informed Magloire that while he was on vacation he received

15 emails regarding Magloire's complaints from his superiors all the way up from the Department Fire Chief Chad Jones.

51.    Without the benefit of any investigation into the complaints, Chief Potter told Magloire that he did not think Magloire was being bullied and that he was only being subjected to valid forms of job related discipline for performance issues, to which Magloire responded by asking "What performance issues?"

52.    Potter did not identify any performance issues, and Magloire reminded him that he had just received a life saving award, a positive performance evaluation and had not received a written up that would support any disciplinary action.

53.    On or about August 4, 2022, Magloire was instructed to attend a meeting with Chief Nears, which was facilitated by the Fire Department's Psychologist Dr. Carla Moore.  Dr. Moore claimed that she was there to "mediate" a resolution of Magloire's concerns regarding Nears.  Magloire informed Dr. Moore about the harassment and bullying he had endured by Nears and others in the department.  The meeting ended with no resolution of his concerns, but Dr. Moore asked Magloire if he had ever had a psychometric evaluation, to which he responded - No.

54.    The following day on August 5, 2022, Sergeant Perea requested that Magloire be disciplined for alleged minor offenses of failing to clean properly,

eating in a bunk room, not wearing PPE, and allegedly failing to complete EMS reports in a timely manner. The retaliatory allegations were false and unrelated to the essential functions of Magloire's job.

55. A memorandum produced by Defendant reflects that on August 10, 2022, Dr. Moore informed Assistant Chief Jimmy Gittens that she "wanted FF Magloire to have a fitness for duty test to **identify any possible issues or disabilities**." [Emphasis added]

56. On August 16, 2022, Battalion Chief Potter expressed in a memorandum to Division Chief Gittens, that

> "My personal opinion is that he is **mentally unfit to be a firefighter**. He doesn't make eye contact when he is talked to, but he will say that he understands what is being said when asked. He doesn't fully listen to orders or follow them. He is eventually going to cause injury to himself or his crew." [Emphasis added]

57. In response to an information request by Plaintiff's counsel, Defendant produced a second version of the same document dated August 16, 2022, in which the above quoted statement was deleted. This shows a pattern of Defendant altering documents to conceal misconduct, which is prohibited by O.C.G.A § 16-10-20.

58. After consulting with Potter and Gittens, City Psychologist Dr. Carla Moore emailed Fire Chief Chad Jones on August, 19, 2022, recommending that he

require Magloire to undergo an extensive assessment by an evaluating psychologist.   Fire Chief Chad Jones accepted the recommendation.

59.    On September 7, 2022, Psychologist Dr. Carla Moore sent Fire Chief Chad Jones a formal memo requesting a "fitness for duty" examination of Magloire, citing concerns "sent up the chain of erratic behavior, inappropriate verbal response and job performance."  Dr. Moore stated that the examination would "determine if the individual can perform **essential job functions as a firefighter** for the city South Fulton Fire Rescue Department." [Emphasis added]

60.    On September 9, 2022, Magloire received a letter stating that he was placed on administrative leave and ordered to submit to a fitness for duty examination.  The letter referenced a in interest in "ensuring that each employee can perform the **essential functions of his or her position,** with or without a reasonable accommodation" and indicated that "Disability-related accommodations will be provided regarding fitness for duty situations in accordance with applicable law."  [Emphasis added]

61.    The  September 9, 2022 letter also stated that  "[a] Fitness for Duty evaluation should not be used as a substitute for standard disciplinary measures if discipline is appropriate due to behavior or performance problems that have occurred."

62.     On September 12, 2022, Defendant required Magloire to submit to a humiliating fitness for duty examination conducted by Dr. Joseph Hill.  Dr. Hill spoke to Magloire in a crowded room of approximately 20 people and left him there to take a personality test, including 150 questions and an abstract reasoning test.  Magloire waited for 2 or more weeks for the results and obsessed over whether he was going to lose his job or not be allowed to return to duty.

63.     On September 22, 2022, Deputy Chief Pat Wilson instructed Magloire to attend a meeting with himself and Chief Administrative Officer Natailie Riggs on September 26, 2022 to discuss the results of the fitness for duty examination.

64.     Without sharing any test results with Magloire, Wilson and Riggs informed Magloire that Dr. Hill had recommended the adverse action that he be reassigned to the Logistics Department for one year to "give [him] time to develop [his] skill set as a firefighter."

65.     Magloire was shocked and confused because he was not made aware that he had any skill set deficit, and he was previously told by Chief Gittens and the September 9, 2022 letter that the fitness examination could not be used as a substitute for disciplinary action to address behavioral or performance issues.

66.     In fact, City Policy Number: 307 -18 Re: Fitness for Duty Evaluations - specifically states "A Fitness for Duty evaluation should not be used as a

substitute for standard disciplinary measures if discipline is appropriate due to behavior or performance problems that have occurred."

67.    During the meeting on September 26, 2022, Magloire asked Chief Administrative Officer Natalie Riggs and Deputy Chief Pat Wilson about the status of the investigation of his harassment and bullying complaints.  Riggs said they could not discuss it with Magloire but his complaints were still being investigated.

68.    At the meeting on September 26, 2022, Defendant made Magloire sign a document.  The document presented Magloire with a single ultimatum, disguised as 3 undesirable options.  Either he: 1)  agreed to be moved to logistics and be evaluated by a psychologist every 3 months, or 2) he could resign or 3) they would terminate him.  Nothing in the document mentioned anything about a work improvement plan nor any documented problems with Magloire's performance. Under extreme duress, Magloire signed the document in an effort to preserve his job.

69.    At the end of the meeting, Magloire asked Chief Wilson for a status update on his harassment investigation.  Chief Wilson stated that his complaint was still under investigation.

70.    Chief Wilson took Magloire to meet with Chief Chad Jones and Logistics Chief Hilda Moses.  They explained the responsibilities Magloire would be tasked with in the Logistics position and Magloire confirmed that he had

17

accepted the re-assignment to Logistics to preserve his job.  Magloire asked Chief Chad Jones for an update regarding his harassment complaint investigation, and Chief Jones responded that he could not speak to him about an ongoing investigation.

71.    On October 1, 2022, Magloire reported to the Logistics department and met with his new supervisor Captain Wayne Gillard, who was surprised to see Magloire.  Captain Gillard told Magloire that no firefighter has ever been reassigned to work in Logistics.

72.    After Magloire informed Captain Gillard about the harassment he complained about and the retaliatory fitness for duty test that led to his forced reassignment to Logistics, Gillard stated that he was meeting with Chief Chad Jones that day and would ask him about the status of Magloire's harassment complaint investigation.

73.    Later that day, Captain Gillard informed Magloire that he had spoken to Chief Chad Jones about the complaint and that, incredibly, the Chief "denied having any knowledge about his complaint or any investigation."  Captain Gillard relayed Chief Jones' instruction to Magloire that if he wanted the matter investigated that he had to file a formal complaint to Human Resources.

74.    Magloire was so shocked and devastated that Chief Jones was pretending that he had never complained, and that he was being made to start the

18

process all over again after persistently seeking updates regarding the status of his November 2021 complaint for nearly a year.

75.     Magloire told Captain Gillard that he needed to be placed on FMLA leave due to stress from how he was being harassed, ignored and demoted for complaining about the harassment.  Captain Gillard said that he understood why Magloire needed to take leave and granted the leave request.  Magloire was placed on FMLA leave for one month.

76.     While Magloire was out on FMLA leave, Magloire submitted a complaint letter on October 4, 2022 addressed to HR Manager Hope Blakely.  The complaint summarized the assault, harassment and retaliation he was subjected to, and had previously complained about.

77.     Captain Gillard advised Magloire to file a complaint with the EEOC. On October 7, 2022, Magloire contacted the EEOC to complain about the harassment and retaliation he was experiencing.  Afterwards, Magloire informed Captain Gillard that he had spoken to the EEOC, as he had advised.

78.     On October 14, 2022, Magloire met with Hope Blakely, which was the first time in nearly a year that his complaints had received any attention from Human Resources.

79.    A recorded conversation with Blakely reflects that they discussed Magloire's complaint letter and he expounded further regarding various details and names of witnesses.

80.    Blakely informed Magloire that none of his previous complaints, including the written complaint to Captain David Roseboro in November 2021, were received by Human Resources.

81.    Magloire left the meeting with the distinct impression that Blakely had no intention of conducting any real investigation of the matter and she was just going through the motions to allow the City to argue that they conducted an investigation.

82.    A month later on November 3, 2022, Magloire met with Logistics Chief Hilda Moses and Captain Gillard and they presented him with a document that he had never seen before.  The document was a revision of the document Magloire had previously signed on September 26, 2022.

83.    In addition to the option of reassignment to Logistics, which Magloire had already signed off on at the September 26, 2022 meeting, the document included some performance improvement conditions that were not previously presented to nor discussed with Magloire.

84.    Notably, the work improvement plan Chief Hilda Moses and Captain Gillard wanted Magloire to sign was back-dated to October 7, 2022, just three days

after he submitted his complaint to HR.  Defendant informed Magloire that he needed to sign the letter or face termination.  Magloire was surprised and he told Chief Hilda Moses and Captain Wayne Gillard that he had already signed a document agreeing to the transfer but never agreed to any work improvement plan.

85.   The back-dated document presented to Magloire at the meeting on November 3, 2022 included language asking him to agree to "quarterly reviews of your work performance as well as progress in developing your skills."

86.   Magloire refused to sign it because he objected to Defendant's attempt to mischaracterize the fitness for duty issue as involving legitimate concerns regarding his performance, in violation of City Policy Number: 307-18 Re: Fitness for Duty Evaluations.

87.   During the recorded meeting, Chief Moses specifically stated that "you had to go do a fit for duty exam because it was discovered and documented that you're incapable of performing under stress."

88.   At the meeting on November 3, 2022, Magloire told them that because of his complaint of harassment and bullying that he was being retaliated against. Magloire also reminded them that City policy specifically prohibits the use of fitness for duty examinations to address performance concerns and that it was unfair to use his stress resulting from the harassment as basis to claim that Magloire was unfit for duty.

89.    Chief Moses responded that "the fit for duty was not for job performance per se,  . . the fit for duty was because there were a number of concerns brought up in terms of your ability to perform in a stressful environment."

90.    The meeting recording reflects that Magloire was not given an order on November 3, 2022 to sign the document.  Magloire did not sign the false and misleading document after both Chief Moses and Captain Gillard agreed that it needed to be revised.

91.    Even if Magloire had been ordered to sign the document, it would have been an illegal order and violative of federal law and the City's non-harassment, non-retaliation and fitness for duty evaluation policies.

92.    At the recorded meeting on November 3, 2022, Chief Moses and Captain Gillard  both acknowledge that "the ball was dropped" regarding the investigation of Magloire's previous complaints.  They also acknowledged that if there was a performance issue, that reassignment to Logistics would have no training value to improve performance.

93.    The November 3, 2022 meeting ended with Captain Gillard and Chief Moses saying that they would seek to have the proposal revised to recommend that Magloire be reassigned to the "**Training Unit**" instead of Logistics.

94.    A review of the recording shows that Magloire was not ordered to sign the back dated document, nor was he given a deadline to make a decision

about a reassignment.  Captain Gillard and Chief Hilda Moses stated they were planning to have the document revised with a new recommendation.  Accordingly, it would have made no sense for Magloire to sign the document at that time.

95.     Chief Moses and Captain Gillard  also made it clear that there was no scenario under which Magloire would be permitted to return to operations.

96.     This recorded meeting confirmed that leadership was well aware that Magloire had already contacted the EEOC before Defendant asked Magloire to sign a back-dated performance improvement plan document.

97.     Coercing Magloire to sign a back-dated performance improvement plan was a thinly-veiled attempt to conceal Defendant's misconduct, by creating some documentation of performance concerns.

98.     A week later, during a recorded meeting on November 10, 2022, HR representative Hope Blakely informed Magloire that, allegedly, no witnesses corroborated the claims in his complaint and that she believed there was no merit to my complaint.  However, when Magloire asked her who she had interviewed, she acknowledged that she had not yet interviewed a number of key witnesses he had identified in the initial meeting on October 14, 2022.

99.     Blakely falsely claimed that Magloire provided her with no evidence to support a hostile work environment, and that his experiences with coworkers

and supervisors did not constitute harassment because they "were only trying to assist you."

100.   During the recorded meeting, Blakely also acknowledged that the incident with Chief Nears questioning Magloire about his sex life did not have my witnesses, so there would not have been corroborating witnesses to that occurrence.

101.   Blakely stated that Training Supervisor Blackman expressed that he had concerns that Magloire may have a **learning disability,** which was something that no one had previously expressed to Magloire.  Blakely apparently ignored that a perceived disability is also a protected class that can not lawfully form the basis for employment decisions.

102.   Blakely made no genuine effort to assess the credibility of the select few witnesses she interviewed.   She simply accepted their statement as true to assist Defendant in preparing a defense to Magloire's claims.

103.   Blakely gave no consideration to Magloire's right to complain about harassment without being subjected to retaliatory disciplinary actions, regardless of whether she believed his harassment complaints lacked merit.

104.   Blakely never investigated Magloire's retaliation concerns or the obvious issue of him being subjected to discrimination based on a perceived disability.

105.   After Blakely said her investigation was complete, Magloire asked why she had not spoken to key witnesses such as Jimmy Gittens, who he had mentioned several times in his initial meeting with Blakely.  In fact, Blakely also mentioned Gittens several times during the recorded November 10th meeting.

106.   Blakely gave Magloire a copy of her sham Investigative Summary, which indicates she had only interviewed 4 people via MS Teams on October 18, 2022, including supervisors whom Magloire had accused of harassment.  Blakely neglected to interview Captain Sammy Hart, Captain Jimmy Gittens, Dr. Carla Moore, Dr.  Joseph  Hill, Chief Administrative Officer Natalie Riggs, Deputy Chief Pat Wilson, Sergeant Denisha Langston, Captain David Roseboro, Chief Chad Jones, Firefighter Jamel Parham, Captain Wayne Gillard, Sergeant Tim Brown, or Logistics Chief Hilda Moses.

107.   Blakely also indicated in her Investigative Summary Report that she never investigated whether the fitness for duty examination was being misused for retaliatory purposes.

108.   In Blakely's effort to hastily conclude her sham investigation, she stated that interviewing Captain Gittens would not have made a difference because she was "focused on the general allegation" as opposed to the specific allegations.  This was as a transparent acknowledgement that Blakely had no intention of

addressing Magloire's specific allegations, and that she was attempting to limit the scope of the investigation so she could manipulate the outcome.

109.   To make matters worse, Blakley also claimed regarding her failure to interview several witnesses that, "I can't make them interview with me," as if she had no authority or influence as a Human Resource official to compel City employees to participate in a harassment investigation.

110.   After some discussion regarding the need to interview other witnesses, Blakely reluctantly agreed to keep the investigation open so she could interview additional witnesses.  However, she never did interview any additional witnesses.

111.   Despite her agreement to keep the investigation open, she had already revealed in her Investigative Summary her bias and prejudgment in stating that she did not believe Magloire's complaint had any merit and that the harassers were only trying to help Magloire.

112.   Blakely demonstrated a lack of thoroughness in gathering evidence from witnesses and appeared disinterested in investigating Magloire's specific allegations.  She exhibited a tendency to rush to judgment in reaching conclusions about the merits of Magloire's complaints without interviewing key witnesses.  She neglected to make any credibility assessments regarding what certain witnesses stood to lose or gain by not being truthful.

113.   Magloire heard nothing further from Blakely regarding the status of the investigation until well after his employment was terminated, which further indicates that she is attempting to drag out the investigation to avoid reaching any definitive conclusion.

114.   On or about November 11, 2022, Captain Gillard asked Magloire if he had made a decision regarding whether he was willing to be moved back to a training status.  Magloire told him that he was willing to accept a transfer to the training unit to save his job.  Captain Gillard stated "unfortunately, it looks like they're going to dismiss you anyway," based on a meeting Gillard said he had with Chief Chad Jones.

115.   On November 14, 2022, Captain David Roseboro and Captain Eric Patterson instructed Magloire that he had to attend a meeting that day at Headquarters regarding possible termination of his employment.  Magloire asked for a union representative.  The meeting was rescheduled to November 15, 2022 because Defendant emailed his union representative the wrong meeting time.

116.   On November 15, 2022, Defendant did the same thing by emailing Magloire union representative the wrong time for the meeting, but the meeting was held in the presence of Captain Wayne Gillard, Sergeant Tim Brown, and Chief Hilda Moses.  At the meeting Magloire was presented with a termination letter

citing his alleged failure to select an option after completion of his fitness for duty examination.

117.   Magloire was also given a separation letter dated November 15, 2022 from Hope Blakely, the same Human Resources manager who was supposedly still investigating Magloire's harassment and retaliation complaint.   The separation notice stated the reason for termination as "terminated due to being unfit for duty."

118.   At a recorded meeting on November 15, 2022, Defendant offered three false, shifting and inconsistent explanations for Magloire's termination.   First, Defendant claimed Magloire was not fit for duty.   Second, Defendant claimed he failed to follow an order to submit a response to a proposal by November 4, 2022. Third, Defendant claimed that he never signed an agreement to move to Logistics.

119.   A full recording of the November 4, 2022 meeting reflects that Magloire was never given an order or a deadline to submit a written decision to Captain Gillard regarding the referenced options, and he informed Gillard that he was willing to transfer to training to save his job on November 11, 2022.

120.   The fitness for duty report prepared by Dr. Hill did not determine that Magloire had any mental or physical impairment that limited his ability to perform the essential functions of his duties as firefighter. Defendant's reliance on Dr. Hill's speculation regarding Magloire's performance and skills was impermissible under City Policy Number: 307-18, prohibiting the use of a fitness for duty examination

as a substitute for properly addressing performance issues.  Magloire did in fact sign a document on September 26, 2022 agreeing to move to Logistics, under the threat of being terminated.

121.   The document back-dated to October 7, 2022 that Defendant wanted Magloire to sign on November 3, 2022 meeting, included an unfounded work improvement plan, which was inconsistent with Chief Moses' previous acknowledgment that his performance had nothing to do with his reassignment to Logistics.

122.    Magloire was told by Captain Gillard that if he disagreed with the termination decision he would have to file an appeal.

123.   On November 16, 2022, Magloire filed an appeal of his termination.

124.   After Magloire retained counsel, the City offered to return him back to work if he passed a fitness for duty examination, which he did and provided the City copies of the results.

125.   Defendant rejected Magloire's first fitness for duty examination report clearing him to return back to work as Firefighter in Operations.  Defendant claimed that it was insufficient because it was conducted by a licensed therapist, despite the fact that the City's own policy Number: 307-18 allows "other appropriate healthcare providers" to conduct fitness for duty examinations.

126.   Defendant offered no reason for rejecting a second fitness for duty examination report from a Licensed Psychologist supporting that Magloire was fit to return to duty as a firefighter, and still refuses to allow Magloire back to work.

127.   The City of South Fulton and its Fire Department have subjected Magloire to a retaliatory hostile work environment characterized by physical assault, threats of violence, unwelcome sexual jokes, offensive questions about his sex life, denials of job opportunities based on a perceived disability, refusal to comply with its own policies and retaliatory termination of his employment.

128.   The City's refusal to complete Magloire's harassment investigation, its termination of his employment prior to completing the investigation, and its refusal to return Magloire to work despite having produced two a favorable fitness for duty evaluations exhibits ongoing harassment and retaliation that violates Title VII of the Civil Rights Act of 1964 and the Georgia Whistleblower Act, as well as the First and Fourteenth Amendments of the U.S. Constitution.

129.   The revelation from Blakely that some of the adverse actions were motivated by the perception that he has a learning disability, also supports violations of the Americans with Disabilities Act.

130.   Magloire was not presented with any opportunity to discuss whether he has a disability.  Magloire was not asked whether he needed reasonable accommodation and he was not presented with any interactive opportunity to

explore how he could perform his job duties with or without a reasonable accommodation.

131. After reporting the misconduct and policy violations by his supervisors and being terminated for complaining, Magloire experienced depression, sleeplessness, anxiety and financial distress.

## CAUSES OF ACTION

### COUNT ONE
### RETALIATORY HARASSMENT AGAINST
### (Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-3(a))

132. Plaintiff re-alleges the allegations in the preceding paragraphs as if set forth herein.

133. Plaintiff engaged in protected activity under Title VII by reporting to several of Defendant's supervisors, Defendant's Human Resources Department and the EEOC that he was being subjected to a discriminatory, abusive and retaliatory work environment in the South Fulton Fire Department.

134. Defendant, through various employees, supervisors and agents of its fire department, retaliated by subjecting Plaintiff to a steady barrage of adverse actions that would dissuade a reasonable employee from complaining about discrimination in the future, including but not limited to;

a. pressuring him not to report his concerns regarding harassment and bullying to HR,

b. refusing to forward his harassment complaint to HR for investigation,

c. engaging in unethical efforts to disprove his claims, including the forgery, destruction, withholding and alteration of relevant documents,

d. threatening him with termination for minor disputes about cleaning,

e. writing him up for minor offenses unrelated to his essential job functions,

f. forcing him to retake a probationary exam that he had already passed,

g. placing him back on probation despite his repeated passing of the probation testing,

h. keeping him on probation despite his re-taking and passing of the probationary tests,

i. filing false and unnecessary disciplinary reports,

j. rejecting the validity of his complaints prior to investigating them,

k. weaponizing the fitness for duty examination process to retaliate against him for complaining about harassment,

l. refusing to comply with the City's own policy regarding fitness for duty examinations,

m. refusing to disclose the fitness for duty examination results to plaintiff,

n.  refusing to provide him with a copy of the documents referenced in the sham fitness for duty report,

o.  pressuring him to sign a back-dated performance improvement plan containing false accusations,

p.  pressuring him to agree to a transfer to the logistics unit,

q.  conducting a sham investigation that ignored clear evidence of discrimination and retaliation,

r.  impeding his access to Defendant's internal appeals process,

s.  rejecting two independent reviews of the original fitness for duty examination, finding that the original conclusions were unsubstantiated.

t.  terminating his employment based on false allegations,

u.  and listing him as "Not Eligible" for rehire.

135.   The average temporal proximity between Plaintiff's many instances of protected activity and dissuasive actions was less than 30 days.  Several of the adverse actions occurred immediately after Plaintiff's protected activity, and were sufficiently close in temporal proximity to infer that they were caused by Plaintiff's protected activity.

136.  Plaintiff's protected activity caused Defendant to take the aforementioned adverse actions plaintiff, and the explanations offered for the adverse action are pretext for discrimination retaliation.

137.   As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered compensatory damages including mental anguish, emotional distress, and anxiety.

138.   The retaliation Plaintiff was subjected to by coworkers and supervisors rose to the level of an actionable hostile environment, and violated the City's own harassment and non-retaliation policies.

139.   Defendant knew or should have known about the retaliatory harassment but failed to take prompt and effective remedial action to stop the retaliation.

**COUNT TWO
RETALIATION
(U.S.C.A Const. Amend. 1 and Section 1983)**

140.   Plaintiff re-alleges the allegations in the preceding paragraphs as if set forth herein.

141.   Plaintiff's speech as a citizen and municipal employee on matters of public concern, such as sexual harassment and bullying in the workplace, were motivating factors in the adverse actions Defendant took against Plaintiff.

142.   The adverse action taken against Plaintiff occurred under color of law and resulted in the deprivation of Plaintiff's constitutional rights and federal statutory rights.

143.   While acting under color of law, Defendant's fire department leaders and HR officials demoted, disciplined, terminated and refused to reinstate Plaintiff in retaliation for his protected speech of complaining about physical assault and sexual harassment.

## COUNT THREE
### (Violation of Fourteenth Amendment Due Process Rights and Section 1983)

144.   Plaintiff re-alleges the allegations in the preceding paragraphs as if set forth herein.

145.   Defendant's HR officials, while acting under color of law, deprived Plaintiff of a constitutionally-protected property interest in his employment as a certified firefighter, his liberty interest in his right to pursue his chosen profession free from government interference, and an opportunity for a public name-clearing hearing regarding stigmatizing accusations against him. The process used by Defendant to terminate Plaintiff and the process for appealing the termination lacked fundamental fairness.

146.   Defendant denied Plaintiff access to a hearing before the Ad Hoc Appeal Review Board, and withheld exculpatory documents formally requested by Plaintiff.  Defendant also altered some of the original documents prior to disclosing them to Plaintiff, in violation of O.C.G.A § 16-10-20.

147.  Plaintiff was denied the opportunity to publicly refute stigmatizing accusations in a public forum by arguments, witness testimony or other evidence.

148.  On July 19, 2023, Magloire formally requested via email that Defendant schedule a hearing before the Ad Hoc Appeal Board.  The request was ignored and no response was received by Defendant regarding the scheduling of a hearing.

149.  A person's right to continued civil service employment is entitled to due process under the Fourteenth Amendment of the Constitution.

## COUNT FOUR
## GEORGIA WHISTLEBLOWER ACT
### (O.C.G.A. § 45-1-4)

150.  Plaintiff re-alleges the allegations in the preceding paragraphs as if set forth herein.

151.  Georgia's whistleblower statute (O.C.G.A. § 45-1-4) prohibits public employers from retaliating against public employees who report a violation of, or noncompliance with, a regulation, rule, or law to a supervisor or governmental agency.

152.  Plaintiff, a public employee, engaged in protected activity under the Georgia Whistleblower Act by reporting of discriminatory, harassing and retaliatory conduct outlined in "Count One",  and by disclosing numerous instances of unlawful conduct by his supervisors and department leaders.

36

153.   All of the acts identified above violated laws, rules or regulations that governed the City of South Fulton Fire Department, including conduct that clearly violates Title VII, the ADA, FMLA, GWA, U.S. Constitution and several of the City of South Fulton's own policies.

154.   Plaintiff was subjected to retaliation by Defendant as alleged above, including the incidents alleged in Count One.

155.   As a direct and proximate result of Defendant's violation of the Georgia Whistleblower Act, Plaintiff suffered compensatory damages including mental anguish, emotional distress, anxiety, and economic damages including lost income.

156.   The retaliatory actions of Defendant are ongoing and continue as of the date of this filing, including Defendant's refusal to schedule a requested appeal public hearing before an Ad Hoc Appeal Review Board and refusal to return him to work despite being cleared to do so by a Licensed Psychologist.

## COUNT FIVE
## AMERICANS WITH DISABILITIES ACT
### (Discrimination and Retaliation)

157.   Plaintiff re-allege the foregoing allegations as if set forth herein.

158.   Defendant perceived Plaintiff as disabled, as evidenced by his supervsior's documented comment in an email dated August 10, 2022, stating that he wanted to have Plaintiff subjected to a forced fitness for duty examination "to

identify any possible issues or disabilities." See 42 U.S.C. § 12112(d)(4)(A) (an employee may raise a § 12112(d)(4)(A) claim whether or not he is disabled).

159.   An "employer bears the burden of proving that a medical examination is job-related and consistent with business necessity by demonstrating that: '(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others.'" *Lloyd v. Greater Cleveland Reg'l Transit Auth.*, 1:18-cv-01557-PAB, at *19 (N.D. Ohio Apr. 6, 2022)

160. EEOC guidance, in relevant part, provides that a "medical examination of an employee may be 'job-related and consistent with business necessity' when an employer has a reasonable belief, based on objective evidence, that (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition." (EEOC, Notice No. 915.002, Enforcement Guidance: Disability–Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act).

161. "However, any examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill the essential functions of the job." Id. A fitness-for-duty examination "is not an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably

affect the quality of an employee's job performance." *Lloyd v. Greater Cleveland Reg'l Transit Auth*., 1:18-cv-01557-PAB, at *19 (N.D. Ohio Apr. 6, 2022)

162.   Defendant did not base its decision to force Plaintiff to take a fitness for duty examination on objective evidence that Plaintiff's ability to perform "essential" job functions was impaired by any mental or physical condition or that his was posed a safety risk to anyone.  Instead, Defendant relied on speculation or generalizations about his perceived medical condition.

163.   Defendant's alleged concern that Plaintiff had a medical condition which posed a risk to himself or others was not substantiated by the City's own fitness for duty examination report.

164.   Defendant refused to return Plaintiff to his firefighter position even after the City's own fitness for duty examination report, and two independent reports, revealed that there were no medical conditions impacting Plaintiff's ability to perform the essential functions of his Firefighter duties.

165.   Defendant's stated reasons for its adverse actions against Plaintiff were a pretext for the discriminatory and retaliatory conduct.

166.   Defendant's own Fitness For Duty Policy Number: 307 -18 specifically states, "a Fitness for Duty evaluation should not be used as a substitute for standard disciplinary measures if discipline is appropriate due to behavior or performance problems that have occurred."

167.   Notably, even after the original FFD examination results revealed that Plaintiff had no disabilities or medical conditions, Defendant continued on its course of retaliatory conduct by prohibiting Plaintiff from returning to his regular duties as a firefighter, based the examiner's speculation that he, "may have some performance problems."  Defendant violated its own policy by allowing the FFD examination to be used to address performance issues.

168.   The effect of the practice(s) complained of above has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his perceived disabilities.

169.   The unlawful employment practices complained of above were intentional and malicious.

### COUNT SIX
### REHABILITATION ACT
**(Discrimination and Retaliation)**

170.   Plaintiff re-allege the foregoing allegations as if set forth herein.

171.   The Rehabilitation Act forbids government agencies from engaging in any discrimination prohibited by the Americans with Disabilities Act of 1990 (ADA). 29 U.S.C. § 791(g).

172.   The Rehabilitation Act also forbids retaliation against employees who complain of discrimination prohibited by those statutes. See 42 U.S.C. § 12203

(ADA anti-retaliation provision, applicable to Rehabilitation Act retaliation claims by virtue of 29 U.S.C. § 791(g)).

173.   Plaintiff suffered materially adverse actions by Defendant because of his protected activity, and a causal link connects the two.

### COUNT SEVEN
### FAMILY MEDICAL LEAVE ACT
### (Failure to Restore Firefighter Position)

174.   Plaintiff re-allege the foregoing allegations as if set forth herein.

175.   The Family Medical Leave Act provides for individual liability in addition to employer liability.

176.   Plaintiff was entitled to a benefit under the FMLA because he had worked full-time for Defendant for more than 12 months prior to his application for FMLA.

177.   Plaintiff applied for and was granted FMLA leave by Defendant.

178.   On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay and other terms and conditions of employment. *See Cross v. S.W. Recreational Indus., Inc.*, 17 F. Supp. 2d 1362, 1370 n. 1 (N.D. Ga. 1998) ("An equivalent position must have the same or substantially similar duties and responsibilities, skill requirements, and authority as an employee's existing position.") (internal citation and quotation omitted).

179.   Defendant was obligated to restore Plaintiff to his Firefighter position in Fire Operations upon his return from FMLA leave.

180.   Defendant failed to restore Plaintiff to his Firefighter position in Fire Operations, upon his return from FMLA, as required by law.

181.   Defendant's reassignment of Plaintiff to the Logistics or Training Division was essentially a demotion from his prior Firefighter position.  He was no longer permitted to respond to fires and handle medical emergencies, hazardous material mitigation, vehicle extrications, aircraft emergencies and collapse and confined space incidents, which were the essential functions of his job as a Firefighter.

182.   Plaintiff was harmed and prejudiced by Defendant's interference with his substantive rights under the FMLA.

183.   Plaintiff was harmed and prejudiced when Defendant denied Plaintiff a benefit under the FMLA.

## PRAYER FOR RELIEF

1.  Wherefore, Plaintiff demands judgment against Defendant as follows:

   a.  All damages that may be awarded under Title VII of the of the Civil Rights Act of 1964, ("Title VII") and the Georgia Whistleblower Protection Act (O.C.G.A. § 45-1-4), ADA and the FMLA, and U.S. Constitution,  including lost wages and back pay; general

compensatory damages including but not limited to damages for

mental anguish and emotional distress;

b.  Special damages to the extent allowed by law;

c.  Injunctive relief under Title VII, ADA and FMLA preventing and

prohibiting Defendant from engaging in its present practices in

violation of the laws cited herein;

d.  Reasonable attorney's fees and expenses and costs pursuant to 42

U.S.C. §1988;

e.  Such other relief as this court deems just and appropriate.

Respectfully submitted, the 13th  day of April 2024.


/S/ Arnold J. Lizana
Law Offices of Arnold J. Lizana III
GA Bar No.: 698758
1175 Peachtree Street NE, 10th Floor
Atlanta, GA 30361
T: (404) 207-1559
alizana@attorneylizana.com

**ATTORNEY FOR PLAINTIFF**

43